# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| WARREN DARRELL RIVERS, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  H-07-2968 |
| | § | |
| NATHANIEL QUARTERMAN, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

Warren Darrell Rivers ("Rivers") petitions for federal habeas corpus relief.  A jury convicted Rivers of capital murder in 1988 for killing eleven-year-old Carl Nance, Jr., during an aggravated sexual assault.  In a separate penalty hearing, the prosecution and defense presented evidence relevant to Rivers' punishment.  Texas law determined his sentence by the jury's answers to two special issue questions.  Rivers now claims that constitutional error infected his trial proceedings.

The Court has reviewed the pleadings, the record, and the applicable law, giving particular attention to the Anti-Terrorism and Effective Death Penalty Act ("AEDPA").  Recent jurisprudence confirms that Rivers' jury could not give his evidence full mitigating effect.  Accordingly, Rivers is entitled to a new punishment hearing.  The Court, however, finds no constitutional error in his conviction.  The Court provides the reasons for this ruling below.

## BACKGROUND

Rivers is in the custody of the Texas Department of Criminal Justice, Correctional Institutions Division, pursuant to a judgment and sentence of death from the 228th Judicial District Court of Harris County, Texas, in Cause No. 448,450.  Trial testimony and Rivers' police statement

established his guilt.[1]  On direct appeal, the Texas Court of Criminal Appeals briefly recited the facts

of this case:

> On May 3, 1987, the deceased's mother sent the deceased to get some cardboard
> boxes.  When the boy did not return, the mother went searching for her son, but
> could not find him.  Sometime on May 4, 1987, a neighbor informed the mother that
> the body of a little boy had been found in a house.  The body, which exhibited
> multiple stab wounds, was found in a room with a broken, bloody broomstick, and
> numerous articles of clothing.  The body was later identified as the deceased.  The
> autopsy revealed that the broomstick had been forcibly inserted through the
> deceased's rectum so far as to extend into his intestine, and that a wound to the chest
> had caused the deceased's death.
>
> Based on the testimony of two witnesses who saw the deceased riding his bicycle
> with [Rivers] on the evening of May 3, 1987, the police arrested [Rivers].  [Rivers]
> admitted that he went to the house where the deceased's body had been found to
> have sex with the deceased.  [Rivers] also told the police that the deceased had
> caused the fresh scratch on his face and that the deceased's bicycle was in a field
> nearby.

*Rivers v. State*, No. 70,776 at 2 (Tex. Crim. App. 1993) (unpublished) (cited hereinafter as "Opinion

on Direct Appeal, at __").

After a jury found Rivers guilty of capital murder, the trial court held a separate punishment

hearing.  The prosecution's punishment case emphasized Rivers' prior violent acts, including

previous sexual assaults.  The defense called only one witness, Rivers' mother, who testified about

his unstable childhood, his troubled home life, the abuse that he suffered at the hands of his mother's

companion, and his mediocre performance in school.  The jury then considered Texas' statutory

special issue questions:

Special Issue No. 1

> Was the conduct of the defendant, Warren Darrell Rivers, that caused the
> death of the deceased committed deliberately and with the reasonable expectation
> that the death of the deceased or another would result?

---

[1]     Jerry Guerinot and Doug Durham represented Rivers at trial.  The Court will
generally refer to both attorneys conjunctively as "trial counsel."

2

<u>Special Issue No. 2</u>

Is there a probability that the defendant, Warren Darrell Rivers, would commit criminal acts of violence that would constitute a continuing threat to society?

Clerk's Record Vol. I-F at 1524-25.  Neither the special issue questions nor the jury instructions explicitly told the jury how to consider Rivers' mitigating evidence.  The jury answered each special issue "yes."  The trial court sentenced Rivers to death.

The Court of Criminal Appeals denied Rivers' direct appeal in 1993.  Although Rivers filed a state habeas application in 1996, the lower state court did not issue findings of fact and conclusions of law until August 14, 2002.  State Habeas Record at 199-239.  On November 27, 2002. the Court of Criminal Appeals adopted the lower court's findings and conclusions and, on that basis, denied relief.[2]

Rivers now seeks federal habeas relief.  Rivers' federal habeas petition raises 18 claims:

1.  Texas' special issue questions did not allow the jury to give effect to his mitigating evidence as required by *Penry v. Lynaugh*, 492 U.S. 302 (1989).

2.  The Court of Criminal Appeals erred in finding no *Penry* error.

3.  Terms in Texas' special issue questions are unconstitutionally vague.

4.  Trial counsel provided ineffective assistance by not uncovering and presenting additional evidence to mitigate his punishment.

5.  Trial counsel failed to seek the assistance of a mental-health expert in formulating a punishment-phase defense.

---

[2]     Rivers first petitioned for habeas relief in 2003.  (*Rivers v. Dretke*, H-03-cv-1710 (S.D. Tex.)).  This Court dismissed that case without prejudice so that Rivers could seek state habeas relief on an unexhausted claim.  Rivers then filed a successive state habeas application claiming that he was mentally retarded and thus exempt from execution under *Atkins v. Virginia*, 536 U.S. 304 (2002).  The Court of Criminal Appeals denied relief on his successive habeas action in 2007.  Rivers does not renew his *Atkins* claim in federal court. Respondent does not argue that the Rivers' new habeas action is untimely under the AEDPA's strict limitations period.

6.      Trial counsel did not object to voir dire questions that allegedly encouraged potential jurors to limit their consideration of mitigating evidence.

7.      Trial counsel did not object during voir dire to the trial court's definition of terms found in the special issues.

8.      Trial counsel did not engage potential jurors in adequate questioning.

9.      Trial counsel did not object to a potential juror's dismissal for cause.

10.     Trial counsel's acceptance of two previously challenged potential jurors belied any pretrial strategy.

11.     Trial counsel violated Rivers' constitutional rights by waiving an objection to the prosecution's allegedly racial use of peremptory strikes.

12.     Trial counsel did not prepare the defense's only punishment-phase witness for her testimony.

13.     Trial counsel did not object to the allegedly prejudicial, cumulative, and irrelevant testimony of two witnesses.

14.     The trial court erroneously denied his challenge to the prosecution's use of peremptory strikes.

15.     The trial court violated his constitutional rights by not providing sufficient funds for expert assistance.

16.     The trial court violated his rights by encouraging potential jurors not to give his evidence mitigating effect.

17.     The trial court's comments during voir dire minimized the jury's responsibility for determining his sentence.

18.     The cumulative effect of the trial errors violated his constitutional rights.

Respondent has filed an answer and has moved for summary judgment.  (Docket Entry No. 14).  Rivers has filed a reply and a motion for an evidentiary hearing.  (Docket Entry Nos. 23, 25). Rivers has also filed a cross-motion for summary judgment.  (Docket Entry No. 24).  Although Respondent has not replied to Rivers' summary judgment motion, the parties have already amply briefed the issues.  This case is ripe for adjudication.

## LEGAL STANDARDS

The writ of habeas corpus is an extraordinary remedy.  The Constitution honors the writ of habeas corpus as "a vital instrument for the protection of individual liberty[.]" *Boumediene v. Bush*, ___ U.S. ___, 128 S. Ct. 2229, 2246 (2008).  Federal courts and Congress, however, "adjust the scope of the writ in accordance with equitable and prudential considerations."  *Danforth v. Minnesota*, ___ U.S. ___, 128 S. Ct. 1029, 1040 (2008).  Statutory and judicial principles ensure that "[t]he role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited.  Federal courts are not forums in which to relitigate state trials." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983); *see also Moore v. Dempsey*, 261 U.S. 86, 87-88 (1923) ("[W]hat we have to deal with [on habeas review] is not the petitioners' innocence or guilt but solely the question whether their constitutional rights have been preserved.").

The AEDPA gives statutory effect to the traditional limits on habeas review.  "Congress enacted AEDPA to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and to further the principles of comity, finality, and federalism[.]" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quotation and citation omitted).  The AEDPA requires federal deference to both legal determinations and fact findings made by state courts.

The AEDPA forbids habeas relief on issues "adjudicated on the merits" in state court unless the state decision "was contrary to, or an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The Supreme Court holds that a state court decision is "contrary to" federal precedent when the state court arrives at a conclusion "opposite to that reached by [the Supreme Court] on a question of law" or "the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  *Williams*

*v. Taylor*, 529 U.S. 362, 413 (2000); *see also Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7-8 (2002).  A state court unreasonably applies federal law when it "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the particular facts of the particular state prisoner's case" or when "the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407.  The AEDPA also rigorously defers to state fact findings unless a petitioner presents clear and convincing evidence in rebuttal.  *See* 28 U.S.C. § 2254(e)(1).  The petitioner bears the burden, both under the AEDPA and standard habeas practice, of proving entitlement to relief.

## ANALYSIS

Rivers' federal habeas claims fall into two categories: those attacking his conviction and those attacking his sentence.  Specifically, claims 1-7, 9, 12, and 16-17 all arise from the penalty phase, petition for reformation of his sentence, or only show prejudice in the jury's consideration of his punishment.[3]  Because the Court finds under the jurisprudence flowing from *Penry v. Lynaugh*, 492 U.S. 302 (1989) ("*Penry I*"), that the jury did not have an adequate vehicle to consider his sentence, judicial economy disfavors full review of the remaining claims relating to his sentence.  The Court will first address Rivers' *Penry* claim and then turn to those claims challenging his

_____

[3]    While some claims relate to events, comments or questions made during jury selection (claims 6, 7, 9, 16, and 17), the error Rivers complains of only impacts the jury's consideration of his death sentence.  For example, claim 9 faults trial counsel for not objecting when the prosecution challenged a juror for cause who could not answer the special issues based on the facts of the case alone.  As relief, Rivers only asks that he be "afforded a new punishment hearing." (Docket Entry No. 1 at 37).  To the extent that the above-mentioned claims may touch upon guilt/innocence issues, the Court has reviewed their merits and found that they do not entitle Rivers to habeas relief.  The Court will more thoroughly discuss two claims which only seek punishment relief, but still relate more concretely to the guilt/innocence phase (claims 8, 13).

conviction.

## I.      Punishment Phase Error

Rivers argues that jury-instruction error invalidates his sentence.  Recent cases have discussed *Penry* jurisprudence in great detail.  *See, e.g., Abdul-Kabir v. Quarterman*, 550 U.S.233 (2007); *Nelson v. Quarterman*, 472 F.3d 287 (5th Cir. 2006).  This Court need not repeat the complete constitutional and legal history of the *Penry* line of cases.  Nonetheless, a brief overview of the *Penry* landscape places Rivers' state and federal proceedings into a broader context.

By the time of Rivers' trial in 1988 the Supreme Court had firmly held that a capital sentencing statute must give effect to a defendant's mitigating evidence.  *See Lockett v. Ohio*, 438 U.S. 586, 602 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 303-05 (1976).  In 1989, the Supreme Court held that Texas' then-applicable procedure did not always provide an effective vehicle for considering some mitigating evidence.  *See Penry I*, 492 U.S. at 327-28.  The Supreme Court found that some elements of the *Penry* defendant's mental retardation and child abuse evidence transcended the jury's specific inquiry under the special issues.  *See id.* at 328 (quoting *Woodson*, 428 U.S. at 305)).

Courts subsequently struggled with how to interpret the contours of *Penry I*.  Nothing in that case signaled a wholesale rejection of Texas' special issues.  The Fifth Circuit and Texas courts, therefore, grappled with deciding "by what principle should the line between *Penry I* and non-*Penry I* evidence be drawn?"  *Robertson v. Cockrell*, 325 F.3d 243, 251 (5th Cir. 2003).  Eventually, the *en banc* Fifth Circuit in *Graham v. Collins*, 950 F.2d 1009 (1992), outlined the principles that it would later distill into a "constitutional-relevancy test," under which the Fifth Circuit denied all *Penry* claims before 2002.  *See Robertson*, 325 F.3d at 256.  The Texas Court of Criminal Appeals applied a standard similar to the constitutional relevancy test in denying Rivers' *Penry* claim on

7

direct appeal.[4]

The Supreme Court began reviewing Texas' response to *Penry I* in the case that resulted from Johnny Paul Penry's retrial. *See Smith v. Texas*, 543 U.S. 37, 43-45 (2004); *Tennard v. Dretke*, 542 U.S. 274, 283 (2004); *Penry v. Johnson*, 532 U.S. 782 (2001) ("*Penry II*"). Subsequently, the Fifth Circuit issued conflicting opinions concerning the state of *Penry* jurisprudence, but generally denied habeas relief. *Compare Robertson v. Cockrell*, 279 F.3d 1062 (5th Cir. 2002), *with Tennard v. Cockrell*, 284 F.3d 591 (5th Cir. 2002), *Dinkins v. Cockrell*, 34 Fed. App'x 963 (5th Cir. 2002) (unpublished), *and Patrick v. Cockrell*, 34 Fed. App'x 150 (5th Cir. 2002) (unpublished). In 2004, the Supreme Court rejected the Fifth Circuit's constitutional relevancy test as a "restrictive gloss on *Penry I*." *Tennard v. Dretke*, 542 U.S. 274, 283 (2004).[5] The Fifth Circuit in turn gave a mixed

---

[4]     The Court of Criminal Appeals recognized that it had "interpreted <u>Penry</u> to mean that a capital sentencing scheme offends no federal constitutional provisions if the scheme both allows the jury to consider relevant mitigating evidence and provides the jury some means of expressing a reasoned moral response to that evidence in making an individualized assessment of punishment." Opinion on Direct Appeal at 10. To that end, the Texas courts considered whether the evidence was "specifically relevant to a defendant's moral culpability" because it "provides a basis for concluding that the defendant is less deserving of capital punishment." Opinion on Direct Appeal at 10 (quotations omitted). At that time, the Texas courts only found *Penry* error if the special issues "provide[d] no means to the jurors to respond in a morally reasoned way[.]" Opinion on Direct Appeal at 11. The Court of Criminal Appeals compared the mitigating evidence from Rivers' trial to that from Penry's and denied relief because: (1) the record of his childhood abuse was not as extreme as in *Penry*; (2) the special issues sufficiently captured the instability and difficulty in his home life; (3) mediocre performance in school did not correspond to Penry's evidence of retardation; and (4) other mitigating testimony was irrelevant to individual sentencing. Opinion on Direct Appeal at 11. The state habeas court based its rejection of the *Penry* claim on similar reasoning when Rivers renewed it in his state habeas application. State Habeas Record at 228.

[5]     The *Tennard* court found that the Fifth Circuit's precedent "ha[d] no foundation in the decisions of [the Supreme] Court." *Id.* at 284. The *Tennard* court instead hinted that a review of whether a jury could adequately consider mitigating evidence involves two factors. First, a court must decide whether the defense presented "relevant" mitigating evidence, a much lower threshold determination than the "constitutionally relevant test" hatched by the
(continued...)

response to *Tennard*, repeatedly distinguishing petitioners' evidence from that presented in *Penry* and *Tennard*.  *See, e.g., Brewer v. Dretke*, 442 F.3d 273 (5th Cir. 2006); *Summers v. Dretke*, 431 F.3d 861 (5th Cir. 2005); *Cole (Abdul-Kabir) v. Dretke*, 418 F.3d 494 (5th Cir. 2005); *Coble v. Dretke*, 417 F.3d 508 (5th Cir. 2005).

Most recently, in *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007), and *Brewer v. Quarterman*, 550 U.S. 286 (2007), the Supreme Court reaffirmed that "sentencing juries must be able to give meaningful consideration and effect to *all* mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future ." *Abdul-Kabir*, 550 U.S. at 246 (emphasis added); *see also Brewer*, 550 U.S. at 294-95.  "[W]hen the defendant's evidence may have meaningful relevance to the defendant's moral culpability 'beyond the scope of the special issues,'" a mitigation instruction is required.  *Abdul-Kabir*, 550 U.S. at 254 n.14.  Simply, "the jury must be allowed not only to consider such evidence, or to have such evidence before it, but respond to it in a reasoned, moral manner and to weigh such evidence in its calculus of deciding whether a defendant is truly deserving of death."  *Brewer*, 550 U.S. at 296.  Thus, the Supreme Court disavowed the reasoning by which the Court of Criminal Appeals denied relief in Rivers' case.

The Fifth Circuit has subsequently applied the *Abdul-Kabir/Brewer* reading of *Penry* jurisprudence. *See Mines v. Quarterman*, 267 Fed. Appx. 356, 362 (5th Cir. 2008); *Chambers v. Quarterman*, 260 Fed.Appx. 706, 707 (5th Cir. 2007); *Garcia v. Quarterman*, 257 Fed. Appx. 717,

---

[5]        (...continued)
Fifth Circuit.  *Id.* at 284.  Second, the Supreme Court reiterated that the ultimate inquiry in a *Penry* case was whether the defendant's evidence had "mitigating dimension beyond" the special issue questions.  *Tennard*, 542 U.S. at 288; *see also Smith v. Texas*, 543 U.S. 37, 43-45 (2004) (reaching the same result in a case on certiorari review from the Texas Court of Criminal Appeals).

723 (5th Cir. 2007); *Coble v. Quarterman*, 496 F.3d 430, 433 (5th Cir. 2007); *Nelson v. Quarterman*, 472 F.3d 287, 316 (5th Cir. 2006). While in at least one recent case the Fifth Circuit has refused to find *Penry* error, *see Smith v. Quarterman*, 515 F.3d 392, 414 (5th Cir. 2008), Respondent makes no argument that the special issues adequately provided a vehicle for the consideration of Rivers' mitigating evidence. In fact, Respondent concedes that "there is no doubt the instructions given to the jury were unconstitutional under *Penry I*." (Docket Entry No. 14 at 20).

        The Court finds that Rivers' mitigating evidence meets *Penry*'s low threshold for relevance. The Court also finds that the special issue questions did not allow the jury to give full mitigating effect to his punishment-phase evidence, particularly that relating to his turbulent home life and childhood abuse. Accordingly, the Court finds that the Court of Criminal Appeals' decision was contrary to and an unreasonable application of federal law. *See* 28 U.S.C. § 2254(d)(1).

        Compliance with the AEDPA standards, however, does not guarantee habeas relief. *See Horn v. Banks*, 536 U.S. 266, 272 (2002) (remarking that no Supreme Court case "ha[s] suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard[.]"); *Robertson*, 324 F.3d at 306 (finding that 28 U.S.C. § 2254(d) "does not require federal habeas courts to grant relief reflexively"). In some cases, jurisprudential principles like the harmless-error doctrine may make habeas relief unavailable. *See Thacker v. Dretke*, 396 F.3d 607, 612 n.2 (5th Cir. 2005). Respondent concedes *Penry* error, but argues that the constitutional violation was harmless.[6]

-------

        [6]      In *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the Supreme Court clarified the application of harmless error in habeas proceedings, holding that "habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.* at 637.
(continued...)

"[T]he question whether some types of *Penry* error might be subject to harmless error review has not been squarely decided by and remains unresolved by the United States Supreme Court." *Garcia*, 257 Fed. Appx. at 724; *see also Smith v. Texas*, 550 U.S. 297, 316 (2007) (Souter, J., concurring) (" In some later case, we may be required to consider whether harmless error review is ever appropriate in a case with error as described in *Penry*[.]  We do not and need not address that question here.").  The Fifth Circuit, however, recognizes that "the Supreme Court has *never* applied a harmless-error analysis to a *Penry* claim or given any indication that harmless error might apply in its long line of post-*Furman* cases addressing the jury's ability to give full effect to a capital defendant's mitigating evidence." *Nelson*, 472 F.3d at 314.  Nevertheless, the Fifth Circuit has held that "it would be wholly inappropriate for an appellate court, in effect, to substitute its own moral judgment for the jury's in these cases." *Id.* at 315.  Given that reasoning, Fifth Circuit precedent "forecloses any argument that a *Penry* error can be subject to harmless error review." *Mines*, 267 Fed. Appx. at 362 n.3; *see also Nelson*, 472 F.3d at 314-15.

Respondent may wish to preserve for appellate review the question of whether *Penry* error can be harmless.  Nevertheless, Respondent has not shown any legal authority that would allow this Court to distinguish or disregard the Fifth Circuit cases holding that *Penry* error cannot be harmless. This Court must follow Fifth Circuit law and assume that the *Penry* error affected the jury's sentencing decision.

The Constitution entitles Rivers to a new punishment hearing in which the jury can fully consider his mitigating evidence.  The Court grants habeas relief on Rivers' *Penry* claim.

---

[6]        (...continued)
The *Brecht* standard requires a court to consider and determine "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

Accordingly, judicial economy disfavors full development of any additional issue from Rivers' habeas petition that does not challenge his conviction.[7]

## II.   Claims Relating to the Guilt-Innocence Phase

The remainder of Rivers arguments (claims 8, 10, 11, 13-15, and 18) attack the validity of his conviction.  The Court finds that Rivers has not demonstrated that those claims entitle him to a new trial of his guilt.

### A.   Ineffective Assistance of Counsel

Rivers raises several claims that challenge his trial attorneys' efforts before the punishment phase.  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  Under the *Strickland* standard, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." *Yarborough v. Gentry*, 540 U.S. 1, 3, (2003); *see also Wiggins v. Smith*, 539 U.S. 510, 520 (2003).  "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700.

To establish deficient performance, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct." *Wiggins*, 539 U.S. at 521.  Instead, "[t]he proper measure of attorney

---

[7]     As Rivers asks for an evidentiary hearing on claims 1, 2, 4-8, 10, 12, and 18 – all of which challenge the integrity of his sentence – the Court will deny Rivers' request for an evidentiary hearing.  Rivers also asks the Court to hold an evidentiary hearing on claim 14. This Court can consider the merits of that claim sufficiently without additional factual development.

performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688.  In reviewing ineffectiveness claims "judicial scrutiny of counsel's performance must be highly deferential," and courts must make every effort to eliminate "the distorting effect of hindsight." *Id.* at 689.  An ineffective-assistance claim focuses on "counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct[,]" because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence[.]" *Id.* at 689-90.

A petitioner must also show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694; *see also Wiggins*, 539 U.S. at 534.  A reasonable probability is one that is sufficient to undermine confidence in the outcome.  *See Strickland*, 466 U.S. at 689; *Wiggins*, 539 U.S. at 534. The Court does not consider prejudice in a vacuum.  "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695.

To merit habeas relief, however, a petitioner must meet "the doubly deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard." *Knowles v. Mirzayance*, ___ U.S. ___, ___ S. Ct. ___, 2009 WL 746274 *8 (Mar. 24, 2009).  "It bears repeating that the test for federal habeas purposes is not whether [a petitioner] made that showing [required by *Strickland*].  Instead, the test is whether the state court's decision – that [a petitioner] did not make the *Strickland*-showing – was contrary to, or an unreasonable application of, the standards, provided by the clearly established federal law (*Strickland*), for succeeding on his [ineffective-assistance] claim." *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003).  "Of course, in reaching [the] decision, [a federal court] must consider the underlying *Strickland* standards." *Id*. at

444.  As discussed below, Rivers fails to show that the state court's adjudication of his *Strickland* claims was contrary to, or an unreasonable application of, federal law, *see* 28 U.S.C. § 2254(d)(1), or that he otherwise merits habeas relief.

*1.     Questioning Potential Jurors (claim 8)*

Rivers argues that trial counsel "failed to engage prospective jurors in meaningful voir dire." Rivers contends that trial counsel's questioning during jury selection was "minimalistic" in comparison to that by the prosecution.  (Docket Entry No. 1 at 34).  Rivers argues that the limited voir dire indicates that trial counsel had no trial strategy and that no justification exists for failing to learn more about the prospective jurors' views.[8]

On state habeas review, trial counsel explained why their questioning was often shorter than that by the prosecution:

> During capital jury selection, the State questions a prospective juror before the defense.  By the time the defense questions the juror, we have listened to the State's voir dire, the trial court's questioning, and the prospective juror's response and watched and evaluated the prospective juror's demeanor.  Therefor, the defense's voir dire is often shorter than the State's because we have already gotten and evaluated pertinent information concerning [the] prospective juror.

State Habeas Record at 240.  The state habeas court found this explanation to be credible.  State Habeas Record at 216.  On that basis, the state habeas court found that Rivers "fails to show that counsel are ineffective for having a shorter voir dire than the State[.]"  State Habeas Record at 233.

Rivers' attorneys provided a valid strategic reason for why their questioning during jury selection was not as lengthy as that by the prosecution.  With a preview of the prospective jurors' opinions and beliefs from prior questioning, an attorney could strategically choose not to revisit

---

[8]     Rivers' arguments about *Strickland* prejudice with respect to this issue only involve sentencing issues and the only relief he requests is a new punishment hearing.  Because the jury questioning also extensively addressed issues relating to guilt/innocence issues, the Court will still briefly look at this issue.

14

already well-trod ground.  Nothing in federal law specifies how long an attorney must question prospective jurors.  Rivers has not shown that the mere length of jury selection questioning constitutes a valid basis for federal habeas relief.

Importantly, Rivers has not shown what information his attorneys failed to uncover through more-detailed interrogation.  While Rivers alleges that trial counsel insufficiently queried jurors about punishment-phase issues, he has not identified a line of questioning relating to the guilt/innocence phase that trial counsel neglected to develop.  The *Strickland* inquiry focuses on detailed allegations of error, not general complaints of harm.  Rivers has not shown what avenues of questioning his attorneys did not pursue or what challengeable bias went undetected in the seated jurors.  "[W]ithout a specific, affirmative showing of what the missing evidence or testimony would have been, a habeas court cannot even begin to apply *Strickland*'s standards because it is very difficult to assess whether counsel's performance was deficient, and nearly impossible to determine whether the petitioner was prejudiced by any deficiencies in counsel's performance." *Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir.1994) (internal quotation marks and citation omitted).  Rivers has not shown that the state habeas court's rejection of this claim was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

### 2.      *Accepting Two Previously Stricken Jurors (claim 10)*

Rivers claims that trial counsel erred by allowing two previously stricken potential jurors to serve at trial.  After questioning by both parties, the defense used peremptory strikes against Carrie Kohler, Tr. Vol. 8 at 1904, and Melissa Wagner, Tr. Vol. 8 at 1993.  During the next day of jury selection, the defense reconsidered the dismissal of those potential jurors.  On November 9, 1988, the trial court brought in a panel of twelve new individuals for questioning.  Tr. Vol. 9 at 2318.  The trial court provided their jury questionnaires to the parties.  Both sides "had the opportunity for some

15

40 minutes to view the jurors individually . . . to see their demeanor." Tr. Vol. 9 at 2318. Before the voir dire of those individuals began, trial counsel announced that they would withdraw their peremptory strike of Kohler and Wagner. Tr. Vol. 9 at 2318. The prosecution indicated that they agreed to the restoration of those jurors, "subject to requestioning them before the Court." Tr. Vol. 9 at 2319. The trial court specifically asked Rivers himself if he had any objection to that action, and he indicated that he did not. Tr. Vol. 9 at 2320. The trial court said that it would also allow Rivers to use those peremptory strikes against additional prospective jurors. Tr. Vol. 9 at 2320. The trial court and the parties questioned Kohler and Wagner a second time. Tr. Vol. 9 at 2342-48; Tr. Vol. 9 at 2349-55. Both served on the jury.

Rivers argues that trial counsel should not have recalled the dismissed jurors. Rivers alleges that neither Kohler nor Wagner were favorable jurors for the defense and that no strategy would justify their placement on the jury. Rivers alleges that this action prejudiced his defense in three ways: (1) trial counsel allowed two objectionable jurors to serve; (2) trial counsel limited appellate counsel's ability to challenge other jury selection error; and (3) trial counsel prevented him from having two African-American potential jurors on the voir dire panel, leaving no one on the jury with whom he had a shared racial identity.

Trial counsel's affidavit on state habeas review explained why they entered into the agreement with the prosecution to place the two excused jurors on the jury:

> After we had struck Carrie Kohler and Melissa Wagner as jurors, we reviewed their juror information and looked at the panel which was about to be questioned and decided that Kohler and Wagner would be better jurors. Both jurors indicated during their voir dire that they could follow the law and their oath as jurors.

> We didn't use all our peremptories because we got what we considered a fair, good jury before the peremptories were exhausted. As a defense attorney, the object of jury selection is to get a jury that you think will be fair and impartial and as sympathetic to the defense as possible.

16

State Habeas Record at 241.  The state habeas court found this explanation of their strategy to be credible.  State Habeas Record at 214.  The state habeas court reviewed the two jurors' questioning and questionnaires, implicitly finding that the jurors could be impartial, if not favorable to the defense.  State Habeas Record at 215.  The state habeas court concluded that trial counsel employed "reasonable strategy of deciding to accept two qualified jurors" and that Rivers "fail[ed] to show that he was harmed by counsel's withdrawal of the previous strikes."  State Habeas Record at 233.

An "attorney's actions during voir dire are considered to be a matter of trial strategy." *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995).  Decisions made during jury selection are not an actionable ground for relief unless the underlying strategy is "so ill chosen that it permeates the entire trial with obvious unfairness'" *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983).  While Rivers may now disagree with the composition of his jury, trial counsel offered a strategic reason for seating those jurors, a decision that Rivers approved on the record.  Rivers has not shown by clear and convincing evidence that the trial court was wrong in finding trial counsel's asserted strategy credible.

Further, Rivers makes no complaint that the trial court should have dismissed the two jurors for cause.  While Rivers argues that the jurors were "objectionable," he makes no allegation that either juror was biased against him.  In fact, both jurors expressed a willingness to follow the law and consider the evidence impartially.  Rivers thus makes no allegation that the jury that convicted and sentenced him was not fair and impartial.  For those reasons, the state court's rejection of this claim was not contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

### 3. *Failing to Object to Witness Testimony (claim 13)*

During the guilt/innocence portion of trial, the prosecution called the victim's mother and

17

sister to testify.  The victim's sixteen-year-old sister, Felicia Annette Nance, testified first.  The victim's sister talked about her brother's life.  She also told about identifying his bicycle for the police after the murder.  She explained that neither she nor anyone in their family knew Rivers.  When the prosecution asked her to "tell . . . a little bit about [her] brother's personality," trial counsel objected that her response would not be "probative of any issue sought to be proved at [that] stage of the trial."  Tr. Vol. 12 at 297.  The victim's sister then explained that the victim made friends easily.  The trial court sustained the defense's objection to the prosecution's question of whether she would describe her brother as "very friendly," but allowed her to describe how he would act when he met a stranger: "He acts like he been knowing them.  He say, hi, my name is Carl.  And then he might strike up a conversation.  And then the next time he see that person, he say, that's my friend.  I know him from wherever they met him."  Tr. Vol. 21 at 299.  Trial counsel did not cross-examine the victim's sister.

The prosecution later called the victim's mother, Claudette Nance, as a witness.  Before the victim's mother could testify, trial counsel objected: "our objection to this witness testifying is that we anticipate the State will use this witness to evoke and elicit from the jury sympathy and outrage rather than any material fact that would go either to prove or disprove the State's theory in this case."  Tr. Vol. 12 at 403.  The prosecution explained that they wanted the victim's mother to explain how she sent him on an errand on the day of the murder, how she searched for him, and how her son did not know Rivers.  The prosecution also wanted her to identify her son from a photograph.  Trial counsel strenuously objected because the victim's sister had already identified the victim and described his character, making the mother's testimony repetitive.  Tr. Vol. 12 at 405-07.  The trial court overruled the objection and allowed the victim's mother to testify.  Trial counsel only objected twice to her testimony and, in the place of cross-examination, simply stated:

"Mrs. Nance, I am deeply sorry at your loss, and I have no questions."  Tr. Vol. 12 at 420.

Rivers now faults trial counsel for not making certain objections during the trial testimony: (1) when the prosecution introduced into evidence a photograph of the victim taken before his death; (2) when his sister described his "friendly personality"; and (3) during his mother's description of his amiable character.  Rivers candidly admits that "each of the complained-of errors may not have individually harmed [him]."  (Docket Entry No. 1 at 46).  He invites the Court to view the effect of the testimony in a cumulative manner, focusing mainly on its impact on his punishment phase. Because this Court has already found that the Constitution entitles him to a new punishment hearing, the Court will only examine the challenged testimony as it relates to the guilt/innocence phase of trial.

On direct appeal, the Court of Criminal Appeals found that Rivers waived any complaint dealing with the sister's testimony about the victim's friendly character by not objecting to the initial questions in that vein.  However, the Court of Criminal Appeals ruled:

> assuming arguendo that [he] preserved the error, we would still be unable to conclude that the trial court erred in admitting the testimony.  The record reveals that the deceased never mentioned knowing [Rivers].  The testimony of the deceased's sister is relevant because it provides an explanation concerning how the deceased came to be in [Rivers'] company.  Whether this evidence was more probative than prejudicial constitutes another question, which [Rivers'] relevance objection would have been insufficient to preserve.

Opinion on Direct Appeal at 5.  Having found that Rivers "waived any error and that the evidence was relevant," the Court of Criminal Appeals affirmed.  Opinion on Direct Appeal at 6.

The Court of Criminal Appeals, however, rejected the State's argument that Rivers insufficiently objected to the mother's testimony.  Nonetheless, the Court of Criminal Appeals found:

> While other witnesses testified about some of the same subject matter about which the deceased's mother testified, the deceased's mother related the facts pertaining to

how she sent the deceased on an errand to find some boxes, how the deceased left on his bicycle to travel the short distance to a fruit stand to get those boxes, and how the deceased failed to return to the house. This evidence was relevant to the context of the offense, as it provided an explanation for how the deceased came to be in the areas where he met [Rivers]. . . . In this case, the majority of the testimony of the deceased's mother contained no character elements and did no more than set the context of the offense.

Opinion on Direct Appeal at 252-53. The Court of Criminal Appeals, however, found that trial counsel made no objection when the prosecution had the victim's mother identify him in a photograph, when she stated: "That's my son. That's just what he looked like. He always had a smile." The Court of Criminal Appeals found that trial counsel's general objection to her testimony "failed to afford the trial judge an opportunity to weigh the probative value and prejudicial effect of the photograph and failed to preserve any such issue for review." Opinion on Direct Appeal at 9.

On state habeas, Rivers again complained about the admission of the photograph and the testimony from family members. While finding that the issue was procedurally barred because the Court of Criminal Appeals considered the same issue on direct appeal, the state habeas court alternatively found no error. The state habeas court found that the sister's testimony was relevant because it explained how the victim came to be with Rivers and corroborated other testimony. Importantly, the state habeas court found that Rivers "fail[ed] to show that Claudette Nance's testimony and the identification and admission of [the victim's] photograph were irrelevant, cumulative, prejudicial, and consisted of improper victim-impact testimony[.]" State Habeas Record at 235. The state habeas court also found that "the trial court properly admitted Felicia Nance's testimony as evidence of the circumstances surrounding the offense and relevant evidence which gave an explanation as to how [the victim] and [Rivers] came to be together on the day of the offense." State Habeas Record at 236. The state habeas court specifically found that the testimony

was not "victim-impact evidence"[9] and that it was properly admitted in the guilt-innocence phase. State Habeas Record at 236.

Rivers renews his complaints on federal review.  The Supreme Court has never held that testimony about a victim's character is completely irrelevant to a jury's evaluation of guilt.  Even when identifying the potential for error in some cases, the Supreme Court in *Payne v. Tennessee*, 501 U.S. 808, 823 (1991), assumed that testimony about a victim's good character often has "relevance at the guilt phase of the trial."  *See also Bennett v. Angelone*, 92 F.3d 1336, 1348 (4th Cir. 1996) ("*Payne* suggests that limited background evidence may be admitted – indeed, may have to be admitted – at the guilt phase of trial.").  Rivers does not point to any Texas statute or rule counsel could have relied upon in objecting to the testimony in question.  Rivers has not shown how trial counsel could have excluded the challenged testimony at the guilt phase.

Even if trial counsel should have objected in the instances mentioned above, and assuming that the trial court would have sustained his objection and prevented the challenged testimony from coming before the jury, Rivers still has not shown *Strickland* prejudice in the guilt/innocence phase. The jury considered three options in the guilt/innocence phase: convicting Rivers of capital murder; convicting him of simple murder; or acquitting him.  No question existed as to Rivers' identity as the murderer.  Overwhelming evidence supported his guilt.  Omitting the challenged testimony from the trial evidence would in no way make an acquittal more likely.  Furthermore, the challenged

---

[9]    In *Payne v. Tennessee*, the Supreme Court held that victim-impact evidence is admissible "to show [ ] each victim's uniqueness as an individual human being." 501 U.S. 808, 823 (1991). "Victim impact evidence is [a] method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities." *Id.* at 825. Evidence "about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated." *Id.* at 827.

testimony would not impact the jury's consideration of whether to convict Rivers of capital or simple murder. The challenged testimony was unrelated to the higher intent requirement and existence of an aggravating precursor that form the distinction between those two crimes. The testimony was brief and the prosecution did not unduly emphasize the victim's character during closing argument. The family members' testimony and related evidence was not of the nature or pervasiveness that would have threatened the trial's fundamental fairness. In short, the testimony that Rivers finds objectionable would not have changed how the jury evaluated his guilt. Rivers has not shown an entitlement to federal habeas relief on this claim.

B.      *Batson* Error (claims 11, 14)

Rivers accuses the prosecution of racial discrimination in its use of peremptory challenges. The prosecution struck three African-American potential jurors without giving any explicit race-neutral explanation. Rivers now argues that: (1) the prosecution violated *Batson v. Kentucky*, 476 U.S. 79 (1986), by striking jurors because of their race (claim 14), and (2) trial counsel provided ineffective assistance by insufficiently objecting to the peremptory challenges (claim 11). Rivers' arguments are without merit.

In *Batson*, the Supreme Court held that the Equal Protection Cause prevents race from being a factor in the use of peremptory challenges. *Batson* established a three-part burden shifting scheme to address allegations of race-based peremptory strikes:

> First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices. Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.

22

*Rice v. Collins*, 546 U.S. 333, 338 (2006) (quotations and citations omitted); *see also Johnson v. California*, 545 U.S. 162, 168 (2005) (reviewing the *Batson* procedure).  The record of the jury selection process, which the Court summarizes below, shows that the trial court in this case began the *Batson* inquiry, but ended its analysis after finding that Rivers failed to make a prima facie showing of racial discrimination.

*1.     Rivers' Jury Selection and Objections*

Rivers did not object to the prosecution's peremptory strikes when they made each one. After the parties had selected twelve jurors, the defense filed a "Motion to Dismiss the Venire of Twelve Selected Jurors" arguing that the prosecution used its peremptory challenges in a racially discriminatory manner.  Clerk's Record Vol. I-F at 1494.[10]  In particular, the defense challenged the prosecution's peremptory strikes against three female minority prospective jurors: Sherrold Robertson, Helen Hurst, and Evelyn Andrews.  Rivers' motion simply argued that he was black, that the three stricken jurors were also black, and the jurors they had seated were white.  The motion alleged that "[a]ll three stricken jurors were determined qualified to serve after questioning by the Court and attorneys.  The only factors common to each is their sex and race."  Clerk's Record Vol. I-F at 1495.

That same day, the trial court held a hearing.  The trial judge called the case and asked if the parties were ready.  At that point, the defense chose to present a prima facie case of discrimination through the calling of witnesses.  *See Yarborough v. State*, 947 S.W.2d 892, 895 (Tex. Crim. App. 1997) (noting that, while "lawyers are free to call each other as witnesses and to question each other formally and under oath" in *Batson* hearings, "they are also free to dispense with such formalities,

---

[10]     At the end of jury selection, the State still had seven peremptory strikes that it had not used.  Tr. Vol. X at 12.

as is often done"). The defense's choice to make its prima facie case subject to the rigors of cross-examination, the production of evidence, and credibility provide important context to the *Batson* inquiry in this case.

The defense first called a clerk from the state district court in order to introduce into evidence the jury strike list and the juror questionnaires from the three challenged individuals. Tr. Vol. X at 4-6. Next, the defense called Rivers' lead counsel as a witness. On direct, he explained that the defense opposed the prosecutor's peremptory removal of the three African-American jurors. The sum and substance of his testimony was the same as in the written motion: the prosecution struck three qualified African-American jurors and had selected only white individuals to serve on the jury. Tr. Vol. X at 7-8.

The prosecutor extensively cross-examined trial counsel about the *Batson* challenge. The prosecution tried to show that the jury was fair because the defense also dismissed black jurors. Trial counsel could not recall exactly, but also could not refute the prosecutor's insistence that the defense made four challenges for cause against African-American potential jurors. Tr. Vol. X at 14. Also, the parties had agreed to the dismissal of 20 to 25 African-American potential jurors without questioning them. Tr. Vol. X at 16.[11]

The prosecution inquired into the perceived racial bias in the use of strikes, beginning with Ms. Andrews. Trial counsel would not make a stronger statement than that it was "possible" that the State exercised its peremptory strikes based on the potential jurors' race. Tr. Vol. X at 19-22. The prosecution then reviewed each challenged peremptory strike to show objective reasons that a

---

[11]     When questioned about why the defense did not make objections contemporaneous with jury questioning, trial counsel explained that they did not "deem[] it necessary to object [to the prosecution's peremptory strikes] at the time the State made their strikes." Tr. Vol. X at 19.

prosecutor would not want those potential jurors to serve.  With regard to Ms. Andrews, trial counsel admitted:

> I can truthfully say that there are objective factors other than race, that having been a prosecutor and understanding the type of juror in a capital case a prosecutor would want, that there are other reasons to strike Evelyn Andrews than race.  I don't have an opinion as to whether [the prosecutor] in that specific instance excluded Evelyn Andrews for those other objective reasons or solely because of race.

Tr. Vol. X at 22-23.  When the prosecution asked what those objective factors may be, trial counsel explained: "[her] position with regard to the death penalty for one . . . she was opposed to capital punishment except in a few cases where it may be appropriate."  Tr. Vol. X at 23.  Trial counsel admitted that: "I, as a prosecutor, would not have accepted Ms. Andrews."  Tr. Vol. X at 24.

Trial counsel testified that "other objective factors" probably played into the State's use of a strike against prospective juror Hurst who was also "opposed to capital punishment except in a few cases[.]" Tr. Vol. X at 25-26.  Additionally, prospective juror Robertson was "opposed to the death penalty in all cases."  Tr. Vol. X at 26.  Trial counsel also stated: "[Robertson] struck me as either a person who was not being completely straightforward and honest or a person who was so confused and emotional that she couldn't take a position categorically in her mind."  Tr. Vol. X at 27.  Trial counsel testified that his "opinion with regard to [both prosecutors'] integrity is that [it] is good." Tr. Vol. X at 29-30.

One of the prosecutors then took the stand and read into the record the names of the African-American potential jurors who the parties had dismissed by agreement.  Tr. Vol. X at 31-32.  The defense cross-examined the prosecution about the reasons for the agreed dismissals.  Tr. Vol. X at 32-38.  The prosecutor, however, did not specify why they dismissed the three challenged individuals.

After the parties rested, the trial court announced: "Motion to dismiss the venire of twelve

selected jurors is denied." Tr. Vol. 10 at 38.  Trial counsel asked the trial court to "rule on whether the defense made a prima facie case."  Tr. Vol. X at 38.  The trial court found "a prima facie case was not made. . . . [T]here was no prima facie case established by the defense to show discrimination."  Tr. Vol. X at 38-39.  The State interjected:

> The State:   Your honor, I would also add, and maybe out of turn, but I would like to put in the record that it's the State's opinion the motion itself is deficient in that it does not – has not offered evidence of relevant facts that tend to show the challenges made by the attorney representing the State were made based on race, that from my understanding of Batson and from 35.26(1)[12], there is a third step they must jump through.  And they must show other relevant facts and circumstances of the case themself which show that the State has exercised purposeful discrimination.  And that motion is deficient as well as the evidence that has been presented.
>
> Trial court:   The Court heard – proceeded on the motion.  So if that's an objection, that's overruled.  Because we went ahead and proceeded on the motion.  But the Court finds that there was no prima facie case established by the defense to show discrimination.
> 
> . . .
>
> The State:   Your Honor, at this time with the Court's permission, we would like to go ahead and have [the prosecutor] read into the record his reasons or rationals for excusing those jurors that were of the Negroid race, just in case it ever becomes an issue on appeal, we'll already have it in the record if the Court will give permission to that.
>
> Trial counsel:  We'd object to it, Judge.  The hearing is concluded.
>
> Trial court:   And the rulings have been made, I might add, and not timely offered. We're through.

Tr. Vol. X at 40 (footnote added).

The trial court later issued written findings and conclusions with respect to the *Batson* claim.

The trial court's findings observe that the defendant and many of the witnesses were African-

---

[12]   Former TEX. CODE CRIM. PROC. ANN. art. 35.26 governed the jury selection process and use of peremptory strikes.

American.  Supplemental Clerk's Record Vol. I at 2.  The trial court made general findings about

the jury selection process.  The trial court also found that "the defendant, his attorneys and the State

agreed to release, without questioning, approximately 110 jurors of which 30 were of the negroid

race."  Supplemental Clerk's Record Vol. I at 3.  The trial court noted that the prosecution used only

eight of its peremptory strikes, three of which involved African-Americans.  All those who sat on

the jury were white.  The trial court made the following specific findings about the individual

potential jurors:

18.     That defense counsel, Douglas Durham[,] testified he had no opinion as to whether the exercise of the State[]'s peremptory on 3 venire [members] of the negroid race was an act of purposeful discrimination.

19.     That the State['s] attorneys questioned these 3 jurors the same length of time and about the same subjects as other jurors.

20.     That defense counsel, Douglas Durham[,] testified that in his opinion that the integrity of the two prosecutors, Alice Brown and Bert Graham[,] was good.

21.     That defense counsel, Douglas Durham, testified that there were objective reasons for the state exercising a peremptory strike on Evelyn Andrews.  And that as a State Attorney he would have also struck Ms. Andrews.

22.     That defense counsel, Douglas Durham[,] testified that there were objective reasons other than race for striking[] Helena Hurst.

23.     That defense counsel, Douglas Durham, testified that Sherrold Robertson stated that she was absolutely opposed to the death penalty.  Further, that he stated her demeanor indicated she was not entirely truthful during questioning.

Supplemental Clerk's Record Vol. I at 3-4.

The trial court also entered conclusions of law:

1.     The defendant, Warren Rivers, is a member of the negroid race.

2.     The State's Attorney's [sic] exercised their peremptory challenges for objective reasons other than race.

3.     That the defendant failed to offer evidence of relevant facts tending to show

the State['s] challenges were made for reasons based on race.

4.      That the defendant failed to establish a prima facie case of purposeful discrimination[.]

Supplemental Clerk's Record Vol. I at 4.

When Rivers raised his *Batson* claim on direct appeal, he asked the Court of Criminal Appeals to remand the case for a full Batson hearing in which the State would rebut the alleged prima facie case of discrimination. The State in turn argued that Rivers had not made a prima facie case of discrimination and, even if he had met that threshold, he waived any error by objecting to the prosecution's attempt to give a race-neutral justification. The Court of Criminal Appeals found that Rivers had indeed waived the issue:

> The record reveals that at the hearing, the State offered to read into the record its reasons for striking the three black members of the venire. [Rivers'] attorney objected to this offer and the trial judge refused to allow the State to offer its reasons for striking the veniremembers. We do not believe that [Rivers] should now be able to seek that which he formerly prohibited by objecting, i.e., a recitation of the State's reasons for striking the three potential jurors. While a violation of <u>Batson</u> constitutes error of constitutional magnitude, this Court has previously held that even errors of constitutional magnitude may be waived. <u>Briggs v. State</u>, 789 S.W.2d 918, 924 (Tex. Cr. App. 1990). [Rivers] waived any error related to a <u>Batson</u> claim by objecting to the State's offer to articulate its reasons for striking the three veniremembers who were black.

Opinion on Direct Appeal, at 3.

Rivers again raised a *Batson* claim on state habeas review. The state habeas court concluded that the Court of Criminal Appeals' finding of waiver on direct appeal prevented full habeas consideration of the *Batson* claim. State Habeas Record at 229. The state habeas court, however, considered Rivers' claims in the alternative. The state habeas court issued explicit fact findings reviewing the testimony given in the *Batson* hearing. The state findings especially emphasized trial counsel's testimony as to why he would have dismissed each challenged prospective juror given his experience as a former prosecutor. The state habeas court also reviewed the voir dire examination

28

of each challenged prospective juror and endorsed trial counsel's explanation of why a prosecutor

would not want those jurors to serve.  State Habeas Record at 206-07.  On that basis, the state habeas

court concluded: "the trial court properly denied [Rivers'] motion to dismiss the veniremen of the

twelve selected jurors; the State's strikes of the three prospective jurors complained about at trial

. . . were race-neutral."  State Habeas Record at 230.[13]

Rivers reurges his *Batson* claim on federal review.  Respondent does not argue that the state

courts' repeated findings of waiver prevent federal adjudication of the *Batson* claim.  The Court

finds that Rivers' claims do not merit habeas relief because he does not satisfy *Batson*'s first step

or show that the state court's decision was erroneous.

### 2.    *Batson's First Step*

Rivers faults the trial court for finding that he had not made a prima facie case of

discrimination. A prima facie showing exists when the facts and circumstances create an inference

that the State used peremptory challenges on racial grounds.  *See Batson*, 476 U.S. at 93-94.  *Batson*

anticipated a multifaceted showing at the first step:

[A] defendant may establish a prima facie case of purposeful discrimination in

---

[13]    Despite Rivers' objections to the contrary, the Court must presume the state court
findings to be correct under 28 U.S.C. § 2254(e)(1).  Here, the trial court observed jury
selection, heard the *Batson* motion, considered trial counsel's evaluation of each potential
juror's suitability, and heard the defense's objection to the State offering its own race-neutral
reasons.  That judge found before appeal that the prosecutors "exercised their peremptory
challenges for objective reasons other than race."  Supplemental Clerk's Record Vol. I at 4.
The same judge considered the *Batson* claim Rivers raised on habeas review and issued
explicit fact findings.  The trial judge's continued experience with this case makes the
AEDPA presumption of correctness especially strong.  *See Barrientes v. Johnson*, 221 F.3d
741, 774 n.26 (5th Cir. 2000); *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).  The
AEDPA requires federal deference to state fact findings regarding the State's use of
peremptory strikes, even if the state courts did not make those findings contemporaneous
with a trial-level *Batson* hearing especially where the findings do not require an assessment
of the prospective jurors' demeanor.  *See Moody v. Quarterman*, 476 F.3d 260, 268-69 (5th
Cir. 2007).

selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial.  To establish such a case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race.  Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate.  Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

*Id.* at 96.  At the same time, "*Batson* intended for a prima facie case to be simple and without frills." *Price v. Cain*, ___ F.3d ___, ___, 2009 WL 376785, *2 (5th Cir. Feb. 17, 2009).  A petitioner need only meet the "light burden" of showing "that the facts and circumstances of his case gave rise to an inference that the State exercised peremptory challenges on the basis of race."  *Id.*  The proper "yardstick by which to measure the sufficiency of a prima facie case" is whether "the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.'"  *Johnson*, 545 U.S. at 168 (quoting *Batson*, 476 U.S. at 94).

"The state court's determination that [a defendant] failed to make a prima facie showing is a factual finding" that federal courts "must accord . . . a presumption of correctness, which can only be rebutted by clear and convincing evidence."  *Soria v. Johnson*, 207 F.3d 232, 238 (5th Cir. 2000) (quotations omitted).  The trial court in this case was not unreasonable in halting its *Batson* examination at the first step.  Rivers argues on federal habeas review that he showed a pattern of strikes that established a presumption of discrimination.  In doing so, Rivers contends that he demonstrated a "pattern giving rise to an inference of discrimination" when he showed "he was a member of the negroid race that the State exercised peremptory challenges to remove members of [his] race from the venire, and that the peremptory strikes eliminated all of the black members of the venire[.]" (Docket Entry No. 23 at 53).  *Batson* jurisprudence recognizes that a pattern of strikes may give rise to concerns about discrimination. *See Purkett v. Elem*, 514 U.S. 765, 770 (1995) ("[A]

30

pattern of peremptory challenges of black jurors may establish a prima facie case of discriminatory purpose."); *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 561 (5th Cir. 2001) ("Factors that give rise to an inference of discrimination include, among others, a pattern of strikes against jurors of a certain race[.]").  The force of any pattern in this case, however, vanishes when compared to all the information before the trial court.  *See Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 631 (1991) (emphasizing that "whether a prima facie case has been established requires consideration of all relevant circumstances").

Rivers' showing in the trial court did not go farther than showing that the prosecution used its peremptory strikes against three minority prospective jurors.  Rivers showed the race of the stricken jurors without making any credible allegation that they were stricken *on account of their race*.  When the prosecution repeatedly asked trial counsel if "it is your opinion that [it] was an act of purposeful discrimination[,]" trial counsel conceded that it was "possible" but offered that he had "no opinion" or stated that other objective factors made them unfavorable witnesses for the prosecution.  Tr. Vol. 10 at 21, 24, 26, 28  Trial counsel never declared with any confidence that race was the reason for the prosecutor's strikes, as exemplified by the following colloquy:

> The State:      Now earlier I assume – well, earlier you have told us that you really did not have an opinion as to whether or not Mr. Graham, and I believe myself, exercised purposeful discrimination; is that correct?
>
> Trial counsel: That's correct.
>
> The State:      And yet the entire thrust of your motion is a motion based on your testimony that the State did exercise purposeful discrimination.
>
> Trial counsel: That's correct.  I think the defense has made a prima facie showing of purposeful discrimination.

Tr. Vol. 10 at 29.

In essence, the defense asked the trial court to find that a prima facie case did not require an

inference of purposeful discrimination, it only required identification of jurors' racial identity. A defendant's burden under *Batson*'s first step is not so light that the defense can disclaim any discriminatory motive and still force inquiry into the second step. *Batson* requires a defendant to show "'more than the bare fact that the minority venire-person was struck by peremptory challenge." *Soria*, 207 F.3d at 239 (quoting *United States v. Branch*, 989 F.2d 752, 755 (5th Cir. 1993). "Where the only evidence is that a black prospective juror was struck, a prima facie *Batson* claim does not arise." *Branch*, 989 F.2d at 755; *see also United States v. Wolk*, 337 F.3d 997, 1007 (8th Cir. 2003) ("The mere recitation of the fact that black jurors were struck from the jury cannot alone establish a prima facie case.").

The touchstone of *Batson*'s first step is the "inference that discrimination has occurred." *Johnson*, 545 U.S. at 170. Trial counsel never declared with any confidence that race was the reason for the prosecutor's strikes. Here, trial counsel would not even argue that the prosecutors had exercised purposeful discrimination; it would not be reasonable to assume that the trial court would infer discrimination without the defense championing that cause. The defense only argued that discrimination was "possible," but conceded that objective factors other than race made the jurors unfavorable to the State. The defense simply gave the trial court no reason to assume that the prosecutors reasons for striking the challenged jurors involved racism, rather than their stated opposition to the death penalty. Therefore, the trial court would have no reason to ask the prosecutors to explain their strikes. The defense plainly did not make a showing to prompt additional inquiry into possible racism.

### 3.   *Rivers' Burden to Prove Purposeful Discrimination*

Alternatively, even if the trial court erred by not moving to *Batson*'s second step, reversal of Rivers' conviction is not automatic. Federal inquiry must look deeper than the prima facie

showing.  *See Johnson*, 545 U.S. at 171 n.6 (finding that even in the "unlikely hypothetical in which

the prosecutor declines" to give a race-neutral explanation, habeas relief will not automatically

follow); *Purkett,* 514 U.S. at 768 (finding that, although the trial court conflated the second and third

*Batson* inquiries, "the ultimate burden of persuasion regarding racial motivation rests with, and

never shifts from, the opponent of the strike); *Moody v. Quarterman*, 476 F.3d 260, 267-72 (5th Cir.

2007) (considering the merits of a *Batson* claim when the trial court erroneously ended the inquiry

prematurely).  As one circuit court has noted:

> The three-step inquiry must be applied in congruence with the other legal principles
> articulated in *Batson* and *Purkett*. When this test is properly applied, a prosecutor's
> failure to provide a reason for striking a potential juror is not an automatic violation
> of equal protection.  Such a failure . . . is evidence of discrimination. This evidence
> notwithstanding, the trial court must still proceed to step three before it can
> determine that purposeful discrimination has occurred.

*Yee v. Duncan*, 463 F.3d 893, 900 (9th Cir. 2006).  Assuming that the trial court erred in finding that

Rivers' failed to meet *Batson*'s first step, and that the prosecution erred by not formally completing

the second, Rivers still must prove purposeful discrimination under *Batson*'s third step.

While the trial court did not require the prosecution to explain each challenged peremptory

strike, two factors strongly cut against Rivers' claim for habeas relief.  First, the state court record

is well developed with regard to reasons for which the stricken jurors would not be favorable to the

prosecution.  While not in the traditional format, the prosecution essentially brought race-neutral

reasons before the trial court through cross-examination of defense counsel.  The defense itself

explained that reasons unrelated to race would have prompted the prosecution to strike the jurors.

During cross-examination by the State, defense counsel conceded that race was most likely *not* the

reason for which the State did not want the jurors to serve.  Even if the trial court erred by failing

to complete the three formal steps, all the information necessary to rule on a full *Batson* claim was

available without resorting to the tidy tripartite inquiry.

Second, and most important, a petitioner always maintains the burden in habeas proceedings, even under *Batson*. In the *Batson* context, the "ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Rice*, 546 U.S. at 338. Aside from showing that the three jurors belonged to a minority racial group, Rivers has never made any persuasive showing that race was the reason behind the peremptory challenges. While the stalled inquiry left the defense without explicit explanation from the State that they would have to rebut, they likewise did not weaken their own concession that the stricken jurors were objectively unfavorable to the prosecution. Rivers has not proven that racial animus permeated the voir dire decisions of the prosecution.

While trial counsel objected and ended the *Batson* inquiry, that action cannot amount to ineffective assistance because Rivers still fails to carry his fundamental *Batson* burden. He has never shown that he had a meritorious claim of racial discrimination. Without proving the existence of purposeful discrimination, and showing that the trial court would have dismissed the selected jury on that ground, he cannot meet *Strickland*'s prejudice prong.

The Court finds that the state habeas court's rejection of his *Batson* claims was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1). Rivers has not proved that the prosecution struck prospective jurors for racial reasons or that trial counsel was deficient for preventing additional development of the issue at trial. The Court will deny Rivers' *Batson* claims.

C.      Funds for Expert Assistance (claim 15)

Rivers argues that the trial court limited his ability to put on a meaningful defense by restricting the funds available for investigative assistance. According to Rivers, Harris County in 1988 only provided defense attorneys $600 to retain investigators or mental-health experts. Rivers

34

complains that this limitation on funds thwarted his attorneys from pursuing otherwise-available avenues of investigations.

The state habeas court procedurally barred this claim. The state habeas court found that because Rivers "did not object to the amount of funds provided for investigation and experts at trial, [he was] procedurally barred from advancing such claim on habeas." State Habeas Record at 237. The state courts thus relied on a version of Texas' contemporaneous-objection rule to prevent review. "The Texas contemporaneous objection rule has long been recognized in Fifth Circuit jurisprudence. The essence of the rule is that in order for a party to preserve an issue for appellate [or habeas] review, that party must have made a timely objection with specific grounds for the desired ruling-unless apparent from the context." *Livingston v. Johnson*, 107 F.3d 297, 311 (5th Cir. 1997). The Fifth Circuit "has consistently held that the Texas contemporaneous objection rule constitutes an adequate and independent state ground that procedurally bars federal habeas review of a petitioner's claims." *Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir. 1999); *see also Cotton v. Cockrell*, 343 F.3d 746, 754 (5th Cir. 2003).

Judicial accommodation prevents a state procedural default from becoming an insurmountable barrier to federal review. The Supreme Court has noted that

> [i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). A petitioner bears the burden of showing that he can overcome this procedural hurdle. *See McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991). Rivers' reply to the summary judgment motion does not mention, much less respond to, the argument that procedural law forecloses federal review of this claim.

Even if this Court could consider the substance of Rivers' complaints about the allocation of pre-trial funds, he has not shown that this Court should overturn his conviction on that basis. Rivers bases this claim on an affidavit that trial counsel Doug Durham provided on state habeas review. Mr. Durham stated:

> At the time of Mr. Rivers' trial the Harris County District Courts strictly capped the amount of money available for reimbursement to trial counsel for experts and investigators. At that time $600.00 was allowed for investigators and $600.00 for an expert.

> The financial limitation imposed by the trial court on obtaining investigators and expert witnesses limited to the degree to which we could use these resources in the behalf of Mr. Rivers at his trial.

State Habeas Record at 98. The state habeas court, nonetheless, rejected this claim because trial counsel did not "state that counsel requested and was refused extra funds, does not specify how any extra funds would have been used, and does not detail how [Rivers] was supposedly harmed by the amount of funds available." State Habeas Record at 223. Accordingly, the state habeas court concluded that Rivers "fails to show that the amount of funds available restricted trial counsel's ability to effectively represent [Rivers]." State Habeas Record at 237.

In renewing his claim on federal habeas review, Rivers lists several witnesses who he claims that an investigator would have been able to interview had sufficient funds been available. Also, he claims that trial counsel could not uncover available, but unpresented, mental-health records without additional funds for investigation. Rivers, however, only argued that this information would have helped him put on a stronger case against the death penalty. Even if trial counsel could have built a different punishment-phase case around the testimony these witnesses would have provided, Rivers has not shown how additional investigation would have changed the case he presented at the guilt/innocence stage. Even if the Court were to assume that the trial court's allocation of funds hampered trial counsel's ability to uncover the information Rivers details in his federal habeas

36

petition, he has still not shown how that would have impacted the jury's evaluation of his culpability for capital murder. The Court, therefore, cannot grant relief on this claim.

      D.      Cumulative Error (claim 18)

Rivers lastly complains that all the errors in his trial, even if not affording a viable grounds for relief individually, aggregate into a due process violation. "The cumulative error doctrine provides relief only when the constitutional errors committed in the state court so 'fatally infected the trial' that they violated the trial's 'fundamental fairness.'" *Spence v. Johnson*, 80 F.3d 989, 1000 (5th Cir. 1996) (quoting *Derden v. McNeel*, 978 F.2d 1453, 1457 (5th Cir. 1992)). "[F]ederal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors 'so infected the entire trial that the resulting conviction violates due process.'" *Derden,* 978 F.2d at 1454 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)); *see also Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007). "In order for cumulative error analysis to apply, [a defendant] must have something to cumulate." *United States v. $9,041,598.68*, 163 F.3d 238, 253 (5th Cir. 1998).

This Court has already found that Rivers' *Penry* claim entitles him to a new punishment phase. For the reasons fully discussed with respect to each claim attacking the guilt/innocence phase of his trial, Rivers has not shown that error infected his conviction trial with fundamental unfairness. The Court will deny Rivers' cumulative-error claim.

## CERTIFICATE OF APPEALABILITY

The AEDPA prevents appellate review of a habeas petition unless the district or circuit courts certify specific issues for appeal. *See* 28 U.S.C. § 2253(c); FED. R. APP. PRO. Rule 22(b). Rivers has not yet requested that this Court grant him a Certificate of Appealability ("COA") on his

guilt/innocence claims, though this Court can consider the issue *sua sponte*. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Clear, binding precedent forecloses relief on the claims for which Rivers is not entitled to relief. Under the appropriate standard, Rivers' claims do not require this Court to certify any issue for appellate consideration. This Court will not issue a COA.

## CONCLUSION

For the reasons described above, the Court orders as follows:

1.    The Court **DENIES** Respondent's summary judgment in part and **GRANTS** summary judgment in part. The Court grants Respondent's motion for summary judgment only with respect to the guilt-innocence phase claims.

2.    The Court **GRANTS** Rivers' cross-motion for summary judgment with respect to his *Penry* claim.

3.    The Court conditionally **GRANTS** a writ of habeas corpus. A writ of habeas corpus shall issue unless within 180 days the State of Texas either begins new sentencing proceedings against Rivers or reforms his sentence to life imprisonment. The 180-day time period shall not start until the conclusion of any appeal from this Memorandum and Order, either by the exhaustion of appellate remedies or the expiration of the time period in which to file such appellate proceedings.

4.    The Court denies Rivers' motion for an evidentiary hearing and any other outstanding motions.

5.    The Court will not certify any issue for appellate consideration.

The Clerk will deliver a copy of this Order to the parties.

SIGNED this 30th day of September, 2009.

*John D. Rainey*

_____
JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| WARREN DARRELL RIVERS, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  H-07-2968 |
| | § | |
| NATHANIEL QUARTERMAN, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## FINAL JUDGMENT

The Court conditionally grants Warren Darrell Rivers' petition for a writ of habeas corpus. A writ of habeas corpus shall issue unless within 180 days the State of Texas begins new sentencing proceedings against Rivers or reforms his sentence to life imprisonment.  The 180-day time period shall not start until the conclusion of any appeal from this Order, either by the exhaustion of appellate remedies or the expiration of the time period in which to file such appellate proceedings.

SIGNED this ___ day of _____, 2009.


_____
John D. Rainey
United States District Judge